IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| BOOKER T. HUFFMAN, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | Case No. 2:19-cv-00050-RWS-RSP |
| ACTIVISION PUBLISHING, INC., | § | |
| ACTIVISION BLIZZARD, INC., and | § | |
| MAJOR LEAGUE GAMING CORP., | § | |
| | § | |
| *Defendants*. | § | |

## REPORT AND RECOMMENDATION

Before the Court is the Motion for Summary Judgment of No Standing and No Copyright

Infringement ("Motion I"), Motion for Summary Judgment of No Violation of 17 U.S.C. § 1202

("Motion II"), and Motion for Summary Judgment of Lack of Nexus ("Motion III"), all filed by

Defendants Activision Publishing, Inc., Activision Blizzard, Inc., and Major League Gaming Corp.

(collectively, the "Defendants"). Dkt. Nos. 103, 104, 105. For the reasons that follow,  Defendants'

Motion I and Motion III should be **DENIED** and Defendants' Motion II should be **GRANTED**

**IN PART** and otherwise denied.

## I.    BACKGROUND

As alleged in the Complaint, Plaintiff Booker T. Huffman  is a professional wrestler. He is

famous for winning the "world champion title" while wrestling in the World Championship

Wrestling circuit five times and is often ranked among the "top five heavyweight wrestlers in

history." Dkt. No. 55 at ¶ 13.[1] He has also wrestled for World Wrestling Entertainment ("WWE").

Although best known as Booker T in the ring, he also has an in-ring persona called "G. I. Bro."

---

[1] Plaintiff filed a Second Amended Complaint ("Complaint") on March 13, 2020. Dkt. No. 55. This replaced his July
18, 2019 amended complaint, Dkt. No. 34, which replaced his original February 2 complaint, Dkt. No. 1.

In 2015, Plaintiff hired Travis Huffman (no relation) of Last Sentry Comics, an independent contractor, to create a comic book series titled *G.I. Bro and the Dragon of Death*. *Id.* at ¶ 15. Travis Huffman commissioned artist Erwin Arroza to create complementary artwork. These comic books and drawings depict a special operations hero called G. I. Bro (collectively, the "G. I. Bro works"), which Plaintiff registered with the United States Copyright Office.[2] Complaint at ¶¶ 16–19. He also promoted his character and comic books by appearing at comic book events, sometimes dressed as G. I. Bro, and distributing posters of the G. I. Bro works. *Id.* at ¶ 15. Plaintiff claims Defendants infringed one of the copyrighted G. I. Bro works, reproduced below on the left (the "Arroza Poster" or "Asserted Copyright"), by copying it in their marketing material.[3] Dkt. No. 114-7. Plaintiff also claims that Defendants removed his copyright management information ("CMI") from the Arroza Poster and provided false CMI in violation of the Digital Millennium Copyright Act ("DMCA") pursuant to 17 U.S.C. 1202. *See* Complaint at ¶¶ 25, 32–37.

Defendants are all involved in the video game industry. Notably, Defendants publish a series of multiplayer, first-person shooter games under the general title, "*Call of Duty.*" In 2018, Defendants released *Call of Duty: Black Ops 4*, a "prequel" to the videogame *Call of Duty Black Ops III*. In *Black Ops III*, one of the specialist characters is David "Prophet" Wilkes, who had replaced 90% of his body with cybernetics to enhance his fighting ability. For the *Black Ops 4* "prequel," Prophet is depicted as he was before he remade himself.

---

[2] Plaintiff authored four G. I. Bro drawings and two comic books. The Copyright Office issued a Certificate of Registration for these works in early 2019. The drawings are collectively called the *G. I. Bro Artwork* and the comics are titled *G. I. Bro and the Dragon of Death Intro* and *G. I. Bro and the Dragon of Death*. *Id.* at ¶¶ 15–19.

[3] The Arroza Poster is entitled *G. I. Bro Artwork 1* with the United States Copyright Office. The Copyright Office issued Certificate of Registration No. VAu 1-355-086 for this work, dated February 7, 2019. *Id.* at ¶ 17.

To promote the game, Defendants contend that they commissioned Petrol Advertising, Inc. to create a series of marketing images of the specialists in 2018, including the image on the right (the "Prophet Image"). Dkt. No. 103-46. The ad agency hired live models and conducted several photoshoots with them. The ad agency then created a "composite" by adding graphical elements to the photographs to create the marketing images. Dkt. No. 114-9 at 1, 4; *see also generally* Dkt. No. 103-44. "Composite" is a technique where the ad agency collects references and uses those references as inspiration for the photo shoot and final image. Dkt. No. 114-18 at 36:11–23, 98:14–99:1. This process resulted in various images of the specialists, including the Prophet Image.




**Arroza Poster**



**Prophet Image**

Defendants used the Prophet Image in various ways. They sold posters and calendars bearing the image. *See* Dkt. No. 103-12. They displayed the image alongside other specialists on billboards in New York, Los Angeles, and Chicago. *See* Dkt. No. 103-13; Dkt. No. 103–14 at 8, 16, 17, 24, 42–45, 50. They even used the image in artwork placed in metallic game cases called "Steelbooks," which are part of special edition bundles of *Black Ops 4*. Motion II at 4 (citing Dkt. No. 103-1 at ¶¶ 4–8); *see also* Dkt. No. 114-12 at 4. *Black Ops 4* was a success, selling "more than $500 million in sell-through worldwide in its first three days of" release. Dkt. No. 114-27.

Alleging the Prophet Image is an unauthorized copy of his Arroza Poster, Plaintiff sued Defendants for copyright infringement and DMCA violations in February 2019. *See* Complaint at 8–9.

## II.    APPLICABLE LAW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Any evidence must be viewed in the light most favorable to the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when there is no genuine dispute of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine [dispute] of material fact." *Anderson*, 477 U.S. at 247–48. The substantive law identifies the material facts, and disputes over facts that are irrelevant or unnecessary will not defeat a motion for summary judgment. *Id.* at 248. A dispute about a material fact is "genuine" when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The moving party must identify the basis for granting summary judgment and evidence demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323.

## III.    ANALYSIS

### a.   Motion I: No Standing and No Copyright Infringement

Defendants contend that Motion I should be granted for two reasons: (1) Plaintiff assigned away the Asserted Copyright, denying him standing in this case; and (2) Plaintiff cannot provide evidence establishing a genuine dispute of fact as to certain elements of copyright infringement.

4

### i. Standing

Defendants first argue that Plaintiff has no standing to bring suit since he assigned the Asserted Copyright to WWE. Defendants point to "Contractor Nostalgia Agreements" (collectively, the "NAs") that Plaintiff and WWE entered into as constituting an assignment of rights. Plaintiff entered into the first agreement with WWE in 2011 for a five-year term ("2011 NA"), Dkt. No. 103-51, and executed in 2017 a nearly identical updated agreement effective for five more years ("2017 NA"), Dkt. No. 103-52, which is still in effect today.[4]

Defendants argue that "[u]nder the explicit and unambiguous terms of the NAs, WWE owns all rights, including all copyrights, to the Arroza Poster (and its constituent images of G. I. Bro), and all other copyrighted works featuring G.I. Bro." Motion I at 14. They contend that the Arroza Poster is derived from Plaintiff's G. I. Bro wrestling persona. *Id*. at 15 (citing Complaint at ¶¶ 14–15; *see also* 2017 NA at ¶¶ 4(a), 5(g), 5(h), and 5(j). They therefore argue that under the unambiguous NAs, Plaintiff assigned away his rights to the Asserted Copyright and accordingly, has no standing to bring a claim of copyright infringement. *See* 17 U.S.C. § 501(b) (establishing that only the "legal or beneficial owner of an exclusive right under a copyright is entitled" to sue for copyright infringement).

Plaintiff first counters that the Certificate of Registration issued by the Copyright Office to Plaintiff is prima facie evidence of Plaintiff's ownership of the copyright. Dkt. No. 115 at 6 (citing 17 U.S.C. § 410(c)). Plaintiff, citing Section 204(a) of the Copyright Act, also argues that Defendants are precluded from raising transfer of the copyright as a defense. *See id*. at 7. Plaintiff contends that courts around the country have held that "where there is no dispute between the copyright owner and the transferee about the status of the copyright, it would be unusual and

---

[4] Besides their effective terms, the NAs are substantively identical. For ease of reference, the Court will use the 2017 NA even though the citations generally apply to both.

unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement" *Wood v. B L Bldg. Co.*, No. CIV.A.H-03-713, 2004 WL 5866352, at *5 (S.D. Tex. June 22, 2004) (quoting *Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc.*, 70 F.3d 96, 99 (11th Cir. 1995)). Plaintiff finally argues that the NAs do not apply to the G. I. Bro works since the agreements limit themselves to intellectual property used "in connection with the business of professional wrestling." Dkt. No. 114-5 at ¶ 4(a). Plaintiff argues that the "G. I. Bro" wrestling persona is distinguishable from the "G. I. Bro" comic book character and the Asserted Copyright at issue in this lawsuit.

While Plaintiff's arguments regarding the Certificate of Registration and section 204(a) fail, his arguments concerning the NAs establish a genuine issue of material fact as to the interpretation of the NAs that precludes summary judgment.

### 1. Certificates of Registration

It is true that the Copyright Office issued Certificates of Registration to Plaintiff for multiple copyrights, including the Asserted Copyright. Dkt. No. 114-1 (establishing the "Effective Date of Registration" of the Asserted Copyright as February 7, 2019); *see also* Dkt. Nos. 114-2–4. Plaintiff is also correct in asserting that a "certificate of a registration . . . shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Plaintiff, however, goes too far in arguing that the Certificate of Registration alone is sufficient to deny Motion I.

The statute explicitly states that the certificates shall only constitute "**prima facie**" evidence. *Id*. (emphasis added). Prima facie means a rebuttable presumption. *See, e.g., U.S. Postal Serv. Bd. Of Governors v. Aikens*, 460 U.S. 711, 714 (1983) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). Defendants have produced evidence, namely the NAs, that

they argue rebuts the presumption created by the certificate that Plaintiff is the owner of the Asserted Copyright.  Accordingly, that evidence must be considered.

### 2.   Section 204(a) of the Copyright Act

Defendants argue that Plaintiff's grant to WWE of an exclusive license to G. I. Bro was a "transfer of copyright ownership" meaning Plaintiff does not have standing to bring a copyright infringement claim. 17 U.S.C. § 101. Plaintiff counters that Defendants should be precluded from raising transfer of the copyright as a defense pursuant to section 204. Plaintiff seems to contend that where there is no dispute between the copyright owner and the transferee about the status of the copyright, a third party cannot raise the issue. Plaintiff cites a host of cases that apparently stand for such a proposition. *See* Dkt. No. 115 at 7–8 (citing *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27 (2d Cir. 1982) (other citations omitted)). To support his argument, Plaintiff also produced an email chain purportedly between Plaintiff's and WWE's counsel, where WWE's counsel agreed that "WWE is asserting no ownership rights to the G.I. Bro comic book character or related art." Dkt. No. 114-26 at 1.

However, § 204 does not stand for the proposition Plaintiff cites. The statute just says that "a transfer of copyright is simply 'not valid' without a writing," which is why it is sometimes called the copyright statute of frauds. *Lyrick Studios, Inc. v. Big Idea Prods., Inc.*, 420 F.3d 388, 391–92 (5th Cir. 2005) (quoting *Konigsberg Int'l, Inc. v. Rice,* 16 F.3d 355, 357 (9th Cir. 1994)); *see also* 17 U.S.C. § 204(a). Nowhere does it prohibit a third-party from raising transfer as a defense. Plaintiff may instead be relying on the line of cases developed from the Second Circuit's decision in *Eden Toys*.

*Eden Toys* involved the copyright to the famous Paddington Bear character and the license to use it. The issue in that case was whether an after-the-fact writing memorializing an earlier oral agreement met the section 204 writing requirement for an effective transfer of copyright. The Second Circuit held that it could in certain limited situations. *Eden Toys*, 697 F.2d at 37.

In 1975, Eden Toys entered into an exclusive written license agreement with Paddington and Co., the copyright owner, allowing Eden Toys to produce certain items using the famous bear. The agreement, however, did not list "adult clothing" as a licensed product. In November 1979, Eden Toys discovered that Florelee Undergarment Co. had been producing and selling a nightshirt with a Paddington Bear print. In 1980, Eden Toys and Paddington amended their licensing agreement to give Eden Toys the "exclusive North American rights to produce any Paddington Bear product." Eden Toys then sued Florelee in April 1980 for copyright infringement. Florelee argued that Eden Toys could not assert an infringement claim for Florelee sales made before April 1980 because that is when it obtained ownership of the relevant copyright through a signed writing as required by section 204(a).

Eden Toys responded that it had been operating under an informal understanding with Paddington in 1979 when it first discovered the Florelee products. The April 1980 amendment, according to Eden Toys, was just a formalization of this oral understanding to amend the 1975 written contract. In the litigation, Florelee raised the absence of a contemporaneous writing licensing adult clothing featuring Paddington Bear as a defense to the infringement claim.

The Second Circuit recognized that an "informal grant of an exclusive license seemingly must fail in light of the statute of frauds provision of the new Act . . . ." *Id*. at 36 (citing § 204(a)). Nonetheless, "since the purpose of the provision is to protect copyright holders from persons mistakenly or fraudulently claiming oral license," the court held that "the 'note or memorandum

of transfer' need not be made at the time when the license is initiated; the requirement is satisfied by the copyright owner's later execution of a writing which confirms the agreement." *Id*. (citations omitted). The court noted that in *"this case,* in which the copyright holder appears to have no dispute with its licensee on this matter, it would be anomalous to permit a third party infringer to invoke this provision against the licensee." *Id*.; *see also Tempest Pub., Inc. v. Hacienda Records & Recording Studio, Inc.*, No. CIV.A. H-12-736, 2013 WL 5964516, at *11 (S.D. Tex. Nov. 7, 2013) (explaining the *Eden Toys* line of cases); *Lyrick Studios*, 420 F.3d at 391–92.

While it may be "anomalous to permit a third party infringer to invoke this provision against the *licensee*," that is not the situation currently before the Court. *Eden Toys*, 697 F.2d at 36 (emphasis added). First, Plaintiff is the licensor, not the licensee. The *Eden Toys* line of cases involves situations where the dispute is whether the licensee, not licensor, has been granted a valid and timely license. *See id*. ("the purpose of the provision is to protect copyright holders from persons mistakenly or fraudulently claiming oral license"). Plaintiff does not cite any cases holding that a third party cannot challenge the licensor's assignment of its copyright.

Second, in the cases cited by Plaintiff, the defendant claimed that an oral transfer to the plaintiff did not satisfy the writing requirement of section 204 despite a later writing memorializing the oral agreement. But here, there is no absence of a contemporaneous writing. The 2011 NA is a written contract predating this litigation and the creation of the G. I. Bro works. In it, Plaintiff explicitly transferred some of his copyrights, among other things, to the WWE. *See* 2011 NA at ¶ 5(g) ("WWE shall own in perpetuity all copyrights in [the Contractor Intellectual Property]"). He reaffirmed this commitment with the 2017 NA, which is still in effect. This is not a situation where an oral agreement was later confirmed in writing. The NAs were both in writing and Plaintiff has been bound to their terms since 2011, well before the creation of the Arroza poster.

The NAs appear to be enforceable contracts between Plaintiff and WWE. The email chain produced by Plaintiff does not change that fact.[5] The true dispute is not the validity or timing of the contracts, but their scope—specifically, the scope of "Contractor Intellectual Property" as used in the NAs.

### 3.   Contractor Nostalgia Agreement

Turning to the substance of Defendants' standing argument, Defendants contend that the NAs explicitly and unambiguously give WWE "all rights, including all copyrights, to the Arroza Poster (and its constituent images of G.I. Bro), and all other copyrighted works featuring G.I. Bro." Motion I at 14 (citing 2017 NA at ¶ 4(a) and Ex. A). They therefore argue that Plaintiff has no standing because he has no rights to the Asserted Copyright. In support, they first argue that Plaintiff used the same name—G. I. Bro—for both his wrestling persona and comics, indicating a connection. Second, they point out that the NAs define Contractor Intellectual Property as those items identified in Exhibit A, which include the term "G. I. Bro." *See* 2017 NA at Ex. A. Third, they argue that beyond Exhibit A, Contractor Intellectual Property is expressly defined as including Plaintiff's "nickname, *ring name*, *likeness*, *personality*, *character*, *caricatures*, *signature*, costume, props, *gimmicks*, gestures, *routines* and *themes*," providing another indication that any use of G. I. Bro was meant to be included as part of the NAs. *See* Motion I at 14 n.8 (citing 2017 NA at ¶ 4(a)).

Plaintiff responds that the NAs do not apply to the G. I. Bro copyright at issue in this case since the agreements specifically limit themselves to intellectual property used "in connection with the business of professional wrestling." 2017 NA at ¶ 4(a). Plaintiff argues that the G. I. Bro

---

[5] The Court has already ruled that the email chain will not be relied upon for these motions.  (Dkt. No. 148).

wrestling persona is distinct from the comic book character G. I. Bro and that the NAs only deal with the wrestling persona. Plaintiff, accordingly, argues that he has standing.

Contract interpretation is governed by state law. The NAs state that they "shall be governed by, and construed in accordance with, the laws of the State of Connecticut . . . ." 2017 NA at ¶ 12(a). Connecticut law requires that a "contract [] be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Murtha v. City of Hartford*, 303 Conn. 1, 7, 35 A.3d 177, 182 (2011) (citing *Remillard v. Remillard*, 297 Conn. 345, 355, 999 A.2d 713 (2010)). "If a contract is unambiguous within its four corners, the determination of what the parties intended by their contractual commitments is a question of law. When the language of a contract is ambiguous, however, the determination of the parties' intent is a question of fact . . . ." *Id*. (citing *Remillard*, 297 Conn. At 355, 999 A.2d at 713) (internal brackets and ellipsis omitted); *see also Ramirez v. Health Net of the Ne., Inc.*, 285 Conn. 1, 14, 938 A.2d 576, 586 (2008).

A contract is "ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." *Cruz v. Visual Perceptions, LLC*, 311 Conn. 93, 103, 84 A.3d 828, 834 (2014). "If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." *Id*. (citation omitted). "A contract is unambiguous when its language is clear and conveys a definite and precise intent" *Id*. at 102–03. "The contract must be viewed in its entirety, with each provision read in light of the other provisions ... and every provision must be given effect if it is possible to do so." *Id*. at 103 (quoting *United Illuminating Co. v. Wisvest–Conn., LLC*, 259 Conn. 665, 671, 791 A.2d 546 (2002)) (ellipsis in original). In essence, courts in Connecticut make the initial determination whether the contract is ambiguous. If it is, then the factfinder resolves the ambiguity.

Contractor Intellectual Property is defined in the NAs as:

4. INTELLECTUAL PROPERTY:
(a) All service marks, trademarks and other distinctive and identifying indicia used by Contractor prior to the Effective Date *in connection with the business of professional wrestling*, including but not limited to Contractor's legal name, nickname, ring name, likeness, personality, character, caricatures, signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by Contractor or in which Contractor has any rights anywhere in the world (collectively, the "Contractor Intellectual Property")

2017 NA at ¶ 4(a) (emphasis added). The NAs are broad. Nonetheless, they clearly limit Contractor Intellectual Property to "the business of professional wrestling." The specific scope of this term is not clear or certain though. The NAs provide little guidance, even when this term is used elsewhere in the agreements. *See id*. at ¶¶ 4(b), 4(c), 8(B).

Furthermore, the parties disagree about the scope of this term. Defendants effectively argue that any material related to one of the categories listed above should be included, even if its relationship to professional wrestling is dubious. For example, Defendants argue that Plaintiff called G. I. Bro a wrestling gimmick of his. They, therefore, contend that any use of G. I. Bro should be included in the NAs. Plaintiff argues the mere use of the term is not enough. Instead, he argues that a connection to professional wrestling is needed for material to fall within the NAs.

Defendants present an attractive, yet flawed, argument. The NAs grant WWE exclusive and far reaching rights for Contractor Intellectual Property. *See* 2017 NA at ¶¶ 4(a), 5(g), 5(h), and 5(j). The NAs also expressly include the term "G. I. Bro" as part of Contractor Intellectual Property. But Defendants never adequately explain how a special forces comic book character is at all connected to the business of professional wrestling. *See* Dkt. No. 103-52 at 2 ("for the use of Talent's intellectual property in connection with WWE branded/licensed products/merchandise."). Accepting Defendants' proposal would essentially render the "in connection with the business of

professional wrestling" limitation in the NAs superfluous, which is unacceptable. *See Cruz*, 311 Conn. at 103 ("every provision must be given effect if it is possible to do so.").

Plaintiff further argues that the NAs contemplate different G. I. Bros. Plaintiff explains in his deposition that he understood there to be two different G. I. Bros. For example, Plaintiff says "that G.I. Bro and this G.I. Bro is two totally different characters . . . one was a wrestler and one was -- a living wrestler and one was a comic book, and a character that could actually do anything." Dkt. No. 114-6 at 36:1–13; *see also id*. at 54:18–55:12; 177:16–23. He believes his understanding of the NAs is confirmed by the email chain between his counsel and WWE's purported counsel, where WWE's counsel said that it was "correct" when asked if "WWE is asserting no ownership rights to the G. I. Bro comic book character or related art." Dkt. No. 114-26. While the Court will not consider the email chain, *see* Dkt. No. 148, Plaintiff's deposition testimony indicates that the parties to the NAs intended the scope of the NAs to be more limited than that argued by Defendants. *See Murtha*, 303 Conn. at 7 ("contract must be construed to effectuate the intent of the parties").

Since the scope of G. I. Bro in the NAs is unclear, the NAs cannot be "clear and convey[] a definite and precise intent." *Cruz*, 311 Conn. at 103. Accordingly, "the intent of the parties is not clear and certain from the language of the contract itself." *Id*. Since the language of the contract is ambiguous, Connecticut law holds that the determination of the parties' intent is a question of fact best resolved by the trier of fact. *See Murtha*, 303 Conn. at 7.

In sum, a genuine issue of material fact exists as to whether the G. I. Bro works, including the Asserted Copyright, are encompassed by the NAs. Accordingly, summary judgment should be denied as to this portion of Defendants' Motion I.

### ii.  Missing elements

Defendants also argue that even if Plaintiff owns the Asserted Copyright, he cannot make out essential elements of copyright infringement. To prove copyright infringement, a plaintiff must prove (1) "ownership of a valid copyright" and (2) "copying" by the defendant. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (citation omitted); *see also Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 576 (5th Cir. 2003) (citing *Eng'g Dynamics, Inc. v. Structural Software, Inc.,* 26 F.3d 1335, 1340 (5th Cir. 1994)).

"In this context, copying has two components: 'factual' copying and 'actionable' copying." *Batiste v. Lewis*, 976 F.3d 493, 502 (5th Cir. 2020) (quoting *Gen. Universal Sys., v. Lee*, 379 F.3d 131, 141–42, 157 (5th Cir. 2004) (per curiam)). "The plaintiff must first establish factual copying, which requires proof that the defendant 'actually used the copyrighted material to create his own work.'" *Id.* (quoting *Lee*, 379 F.3d at 141). As direct evidence of copying can be hard to come by, "copying may be inferred from (1) proof that the defendant had access to the copyrighted work prior to creation of the infringing work and (2) probative similarity" between the copyrighted work and the allegedly-infringing work.[6] *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004) *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010) (citing *Peel & Co. v. The Rug Mkt.*, 238 F.3d 391, 394 (5th Cir. 2001)).

Alternatively, a plaintiff may raise an inference of factual copying without any proof of access if the works are 'strikingly similar.'" *Batiste*, 976 F.3d at 502 (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 113 (5th Cir. 1978)); *see also Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1039 (5th Cir. 2015) (finding that striking similarity means the

---

[6] Plaintiff does not attempt to prove copying through direct evidence.

similarities "can only be explained by copying, rather than by coincidence, independent creation, or prior common source." (citations omitted)).

"Once a plaintiff circumstantially establishes factual copying, the defendant may rebut the circumstantial evidence if he can prove that he independently created the work." *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007) (citing *Positive Black Talk,* 394 F.3d at 367–68).

"Not all copying, however, is copyright infringement." *Feist*, 499 U.S. at 361. If factual copying is proven, the plaintiff must then establish that the copying is legally actionable by showing "that the allegedly infringing work is substantially similar to protectable elements of the infringed work." *Lee*, 379 F.3d at 142. "This usually requires a 'side-by-side comparison' of the works' protectable elements 'to determine whether a layman would view the two works as substantially similar.'" *Batiste*, 976 F.3d at 502 (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 550 (5th Cir. 2015)). "Substantiality is measured by considering 'the qualitative and quantitative importance of the copied material to the plaintiff's work as a whole.'" *Id.* (quoting *Nola Spice Designs*, 783 F.3d at 552).

The parties focus on the factual copying element. Defendants contend that Plaintiff cannot prove copying because Plaintiff cannot show access or striking similarity. To survive summary judgment on that element, Plaintiff must raise a genuine dispute as to either a combination of access and probative similarity or, absent proof of access, striking similarity. *See Armour*, 512 F.3d at 152 & n.3.

## 1.  Access

Defendants argue that they never saw the Arroza Poster prior to this lawsuit being filed. They contend that the individuals significantly involved in creating the Prophet concept art have "averred that they had never seen the Arroza poster prior to this lawsuit, or been to any regional

conventions or website where Plaintiff claims it was shown." Motion I at 16 (citing various declarations from Defendants' key employees). They argue that Plaintiff has produced no evidence otherwise, which is less than the "reasonable possibility of access" the Fifth Circuit requires a copyright infringement plaintiff to establish by the defendant. *Ferguson*, 584 F.2d at 114.

Plaintiff counters that Defendants "attended those events where the poster at issue was displayed." Dkt. No. 115 at 4 (citing Dkt. No. 114-8 at 91:14–96:19). Plaintiff explains that the Arroza poster was "distributed and displayed by Plaintiff at trade shows including the various 'Comic Con' events." *Id*. at 12 (citing Dkt. No. 114-6 at 61:18–63:19, 115:1–6). Plaintiff specifically testified in his deposition that he "displayed [the Arroza Poster] at Comic-Con and gave them out in packets at Comic-Con." Dkt. No. 114-6 at 61:21–22. He explained that the "[p]osters go with me on every appearance" and that this practice "started quite some time ago" and has continued as recently as "within the last year."[7] *Id*. at 62:5, 8, 19. He also points to the deposition by Carolyn Wang, one of Defendants' Rule 30(b)(6) representatives, where she said that she attended the San Diego and New York Comic-Cons. Dkt. No. 114-8 at 92:1–2 ("San Diego Comic I attended in 2012, 2013, '14, '15, '16, '17, '18"); *see also id*. at 91:14–92:23, 96:2–19.[8]

"To establish access, a plaintiff must prove that 'the person who created the allegedly infringing work had a reasonable opportunity to view the copyrighted work" before creating the infringing work." *Armour*, 512 F.3d at 152–53 (quoting *Peel*, 238 F.3d at 394). Plaintiff points to evidence, namely deposition testimony, to establish that he attended various conventions including the Comic Con events before the Prophet Image was created. He explained that the Arroza poster goes with him to every appearance and that he has been going to these events for years, including as recently as last year. Defendants' witness admitted that in that same rough time period, she went

---

[7] Plaintiff was deposed on February 27, 2020. *See id*. at 1.
[8] Ms. Wang implied that there are only two Comic-Con locations—San Diego and New York. *See id*. at 91:14–21.

to the San Diego Comic Con seven times as well as the New York Comic Con. At this stage, any evidence must be viewed in the light most favorable to the Plaintiff as nonmovant. *See Anderson*, 477 U.S. at 255. Based on this standard and the provided evidence, a reasonable jury could find Defendants had a "reasonable possibility of access" to the Arroza Poster at one of these events. *Ferguson*, 584 F.2d at 114. Accordingly, a genuine dispute exists regarding the access element. Regardless, as explained below, a genuine dispute regarding striking similarity exists, making summary judgment as to copyright infringement inappropriate.

### 2.   Striking Similarity and Independent Creation

Finally, Defendants contend that Plaintiff is foreclosed from arguing that the Prophet Image is so strikingly similar to the Arroza Poster that only copying, and not coincidence or independent creation, can explain the similarities. They provide a number of reasons in support. First, they argue that the evidence supports their conclusion of independent creation, which precludes a finding of striking similarity. *See Ferguson*, 584 F.2d at 114 (striking similarity must "preclude the possibility of independent creation"). They point to a photo shoot they commissioned where an advertising company took photos of a model dressed as Prophet as conclusively showing that the Prophet Image was independently created. They thus argue that "[t]here is no genuine dispute that Defendants independently created" the Prophet image. Motion I at 27. This lack of a dispute, according to Defendants, should prevent Plaintiff from presenting this issue to a jury.

Second, they argue that even if independent creation was not precluded, the images are not strikingly similar. Defendants point to some differences between the images that they argue necessitate a finding that the images are not strikingly similar. *Id*. at 24–25 (citations omitted). They argue that the "only similarity" between the Arroza Poster and Prophet Image is that "both

feature Black military men with dreadlocks . . . holding weapons . . . and standing in a generic military pose." *Id*. at 25.

Plaintiff responds that "factual issues surrounding independent creation should generally be left to the jury." *Rally Concepts, LLC v. Republican Nat. Comm.*, No. 5:05-CV-41-DF, 2006 WL 2505307, at *3 (E.D. Tex. Aug. 28, 2006) (citing *Peel*, 238 F.3d at 398). Plaintiff also argues that there is no image from that photo shoot that is identical to the Prophet Image. He points out differences in the photos of the model and the Prophet Image, mainly focusing on the different guns. Plaintiff contends that this shows that the Prophet Image is based on more than just the photo shoot. In support, he points to Defendants' documents and statements where they explain the Prophet Image is a "composite," meaning "a technique that utilizes various images found on the internet and/or other places . . . and creating a Frankenstein version of an image." Dkt. No. 115 at 16 (citing Dkt. No. 114-9 at 1, 4); *see also* Dkt. No. 114-10 at 128:5–16; Dkt. No. 103-44. This technique apparently involves first collecting references and then using those references as inspiration for the photo shoot and final image. Dkt. No. 114-18 at 36:11–23, 98:14–99:1. Plaintiff argues that this contradicts Defendants' claim that the Prophet Image is based solely on a photograph from the photo shoot. At a minimum, Plaintiff urges that this creates questions surrounding independent creation which are best left for the jury to decide.

As for Defendants' second argument, Plaintiff contends that a side-by-side comparison of G. I. Bro and the Prophet Image allows a reasonable jury to find them strikingly similar. Plaintiff takes issue with Defendants' characterization of the G. I. Bro and Prophet Image, saying that Defendants nit-pick at small irrelevant differences between the two. Plaintiff argues that striking similarity can establish factual copying, where the jury may consider both copyrightable and non-copyrightable parts. Dkt. No. 115 at 11 (citing *Positive Black Talk*, 394 F.3d at 369). He argues

that this Court should follow the court in *Am. Registry of Radiologic Technologists v. Bennet*, 939 F. Supp. 2d 695 (W.D. Tex. 2013). In that case, the court denied motions for summary judgments on similarity, finding that striking similarity was a fact question for the jury. *Id*. at 707–08.

Plaintiff has presented enough evidence to create a genuine issue as to independent creation. It is not clear at this time whether Defendants independently created the Prophet Image or instead used the Arroza Poster as inspiration. Accordingly, a jury should make this decision based on the evidence presented at trial. It is not implausible that Defendants saw the Arroza Poster at a comic book convention and used it as inspiration for the final Prophet Image. In a similar vein, the Court rejects Defendants' striking similarity argument. Looking at the Arroza Poster and Prophet Image side-by-side, the two clearly share similarities and potentially even have striking similarities.

Accordingly, Defendants' Motion I should be denied.

### b. Motion II: No Violation of 17 U.S.C. § 1202

Plaintiff also argues Defendants violated the DMCA through their use of the Prophet Image in the *Black Ops 4* marketing campaign. He first alleges that Defendants knowingly provided and distributed false CMI in connection with the Prophet Image in violation of section 1202(a). He also alleges that Defendants intentionally removed Plaintiff's CMI from the Arroza Poster when creating the Prophet Image in violation of section 1202(b). Complaint at ¶¶ 33–34.

In Motion II, Defendants contend "Plaintiff has adduced no evidence to support any element of a Section 1202 claim." Motion II at 1. Defendants first argue Plaintiff cannot prove that they removed his CMI from the Arroza Poster under section 1202(b) because he produced no evidence that they possessed his works. *Id*. at 6. Defendants next argue Plaintiff cannot prove that Defendants provided false CMI in connection with the Prophet Image under section 1202(b).

In 1998, Congress enacted the DMCA to support the efforts of copyright owners to protect their works from piracy. Congress passed section 1202 to protect the "integrity of copyright management information." *Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261, 276 (5th Cir. 2020) (quoting 17 U.S.C. § 1202(b)). The statute relevantly states:

> **§ 1202. Integrity of copyright management information**
> **(a) False copyright management information.**--No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement--
>> **(1)** provide copyright management information that is false, or
>> **(2)** distribute or import for distribution copyright management information that is false.
>
> **(b) Removal or alteration of copyright management information.**--No person shall, without the authority of the copyright owner or the law--
>> **(1)** intentionally remove or alter any copyright management information,
>> **(2)** distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or
>> **(3)** distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,
>
> knowing . . . it will induce, enable, facilitate, or conceal an infringement of any right under this title.
>
> **(c) Definition.**--As used in this section, the term "copyright management information" means any of the following information conveyed in connection with copies . . . of a work . . . or displays of a work, including in digital form . . . :
>> **(1)** The title and other information identifying the work, including the information set forth on a notice of copyright.
>> **(2)** The name of, and other identifying information about, the author of a work.
>> **(3)** The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.
>> . . .
>> **(6)** Terms and conditions for use of the work.
>> **(7)** Identifying numbers or symbols referring to such information or links to such information.
>> . . .

17 U.S.C. § 1202. While Plaintiff has not provided enough evidence to support his section 1202(b) claim, the Court finds questions of fact exists as to the alleged section 1202(a) violations.

### i.   § 1202(b): Removal or alteration of copyright management information

The Arroza poster includes the artist's name and the year it was created—"Arroza '16"—at the bottom of it. The parties do not dispute that this is CMI. *See* 17 U.S.C. § 1202(c). Plaintiff however alleges that Defendants removed this CMI in violation of section 1202(b).

Plaintiff's theory appears to be that since the Prophet Image does not contain his CMI and the Prophet Image is a copy of the Arroza Poster, Defendants must have removed the CMI from the Arroza Poster to create the Prophet Image. However, § 1202 does not cover the mere failure to add truthful CMI to a copy.  Rather this section requires actual alteration or removal of CMI already found on an image.  Plaintiff provides no evidence that Defendants ever altered the Arroza Poster or its CMI. Defendants, on the other hand, provided declarations that those involved in the creation of the Prophet Image never possessed the Arroza Poster. Motion II at 7 (listing relevant declarations).

In sum, Plaintiff has not provided evidence that Defendants removed or altered the Arroza Poster's CMI in any way. *See* § 1202(b)(1). For these reasons, Plaintiff has not provided sufficient evidence to support a claim under section 1202(b)(2) (requiring that the plaintiff prove the infringer knew "that the copyright management information has been removed or altered") or section 1202(b)(3) (same). Since Plaintiff lacks any evidence to support an essential part of his section 1202(b) claim, the Court should grant summary judgment on this claim.

### ii.   § 1202(a): False copyright management information

Plaintiff also alleges that Defendants violated section 1202(a) when they added their own CMI to the Prophet Image, even though they knew the Prophet Image was an illegal copy of the Arroza Poster. Defendants first argue that the Prophet Image is not a copy of the Arroza Poster, relying on their arguments in Motion I. As explained above, this question should be decided by

the fact finder. Defendants next argue that "Section 1202(a) requires that **Plaintiff's** work be distributed by Defendants with incorrect CMI" and that distributing its own work with its CMI does not implicate section 1202(a). Complaint at 11 (citing *Faulkner Press, L.L.C. v. ClassNotes, L.L.C.*, 756 F. Supp. 2d 1352, 1359–60 (N.D. Fla. 2010)). They additionally argue that the Steelbooks do not contain CMI in connection with the Prophet Image due to the location of the CMI within the Steelbooks.

### 1. Original work

The gist of Defendants' argument is that "[d]istributing one's own work with CMI attached does not implicate section 1202(a)." *Id*. at 10. Instead, they argue that to implicate section 1202(a), they would have needed to affix CMI to an Arroza Poster since that is Plaintiff's original work. But Plaintiff provided no evidence to support a finding that Defendants had an actual copy of the Arroza Poster. Thus, Defendants argue summary judgment is appropriate. Defendants mainly rely on *Faulkner Press* for this "original work" requirement.[9]

In that case, a professor at the University of Florida co-authored two electronic textbooks that were published by the plaintiff. *Faulkner Press*, 756 F. Supp. 2d at 1355. The defendant hired student note takers to provide lecture summaries and study materials, which the defendant then edited and published for sale to other students. *Id*. The plaintiff alleged that the defendant removed the professor's CMI and added its own when it copied materials from the textbooks and film study questions into its note packages. The court found that the "note packages that Class Notes produced were a different product" and since "[n]o alteration [was] made to" the original work, "there was no violation of the DMCA . . . ." *Id*. at 1359–60; *see also Frost-Tsuji Architects v. Highway Inn,*

---

[9] The *Faulkner* case as well as most of the other cited cases discuss this issue mostly in the context of section 1202(b).

22

*Inc.*, No. 13-00496 SOM/BMK, 2014 WL 5798282, at *5 (D. Haw. Nov. 7, 2014) (finding that "virtually identical" floor plans created by redrawing the original work does not implicate § 1202).

Plaintiff responds that "[t]hese two cases are not representative of the courts that have addressed the subject" and that the "'original work' requirement is not in the plain language of § 1202." Dkt. No. 116 at 11. Relying on *Faulkner*, he argues, would mean effectively exempting unauthorized, infringing derivative works from the coverage of section 1202. Instead, he contends that a better case to rely upon is *GC2 Inc. v. Int'l Game Tech.*, 391 F. Supp. 3d 828 (N.D. Ill. 2019).

In that case, a jury returned a verdict in favor of the plaintiff. The court refused to set aside the jury verdict and hold "that derivative or collaborative works are categorically excluded from protection under" section 1202. *Id*. at 843. The court specifically rejected the defendant's reliance on cases including those that Defendants cite here, such as *Faulkner Press*. *Id*. The court stated:

> Indeed, the "original work" language on which the defendants precariously rest their entire argument does not even appear in the statute. Rather, it is entirely a product of district court opinions focused on different language . . . The defendants simply argue that because they modified the artwork provided by GC2, creating a derivative work, there was no longer an "original work" from which to remove the copyright management information. That argument is wholly without merit and provides no basis to upset the jury's verdict on this claim.

*Id.* at 843–44. The court ultimately denied defendants' motion for judgment as a matter of law.

It is black letter law that courts cannot add terms to an unambiguous statute. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 17 (2010) (citing *Scales v. United States*, 367 U.S. 203, 211 (1961)); *Thomas v. Reeves*, 961 F.3d 800, 821 (5th Cir. 2020) ("Unambiguous statutes must be left alone"). This Court finds that section 1202(a) is unambiguous. If someone with the specified intent provides false CMI, they have violated section 1202(a). Nothing in the statute exempts derivative works or a defendant's own work.

This conclusion is also supported by the definition of CMI. CMI is defined as "information conveyed in connection with copies or phonorecords of a work . . . ." 17 U.S.C. § 1202(c). The term "copies" is defined as "material objects . . . from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term 'copies' includes the material object, other than a phonorecord, in which the work is first fixed." 17 U.S.C. § 101. This definition, especially the second sentence, strongly supports the notion that copies include more than just the original work.

Since the statute is unambiguous, the Court need not look any further. There is no original work requirement. To the extent the cases provided by Defendants have persuasive value, they are not opposed to this conclusion. First, those cases generally deal with section 1202(b), which has different requirements. For instance, section 1202(b)(1) requires a person to intentionally remove or alter any copyright management information without authority. Copying notes or questions, such as was the case in *Faulkner*, does not alter or remove the textbook's CMI. It was perfectly reasonable for the court to find that section 1202(b) was not applicable.

Similarly, the *Faulkner* court found that the defendant had created its own product even though it used some of the professor's materials. This led the court to conclude that the CMI on the defendant's product was not false. *Faulkner*, 756 F. Supp. 2d at 1359–60 (focusing mostly on the section 1202(b) claim and scienter element of section 1202(a)). This question though is one of fact—one properly reserved for a jury. A jury here could find section 1202(a) has been violated. The fact that images, as opposed to text, are at issue makes this even more true than in *Faulkner*.

As for the language used by the *Faulkner* court, the *GC2Inc.* court said it best when it described the "original work" requirement as "entirely a product of district court opinions focused on different language" in the statute. *GC2Inc.*, 391 F. Supp. 3d at 843–44; *see also id.*

24

In sum, Defendants have not shown that section 1202(a) is inapplicable. Questions of fact remain regarding whether the CMI on Defendants' Prophet Image violates the statute, making summary judgment inappropriate as to this part of Motion II.

### 2.   Steelbooks

While the CMI for the Prophet Image was generally found on the image itself, the Steelbooks are somewhat different. Steelbooks appear to be special edition cases, each containing a physical copy of *Black Ops 4*. The Steelbooks are also wrapped in artwork. The image inside the case shows five specialists with the Prophet Image prominently displayed as the centerpiece. *See* Dkt. No. 103-10 at 5. The only relevant CMI is located on the CD next to the image. Defendants argue that the CMI thus should only relate to the CD, not the other materials within the Steelbook. Plaintiff contends that the factfinder should decide the scope of the CMI, precluding summary judgment.

CMI is defined as "information conveyed in connection with copies . . . of a work . . . or displays of a work, including in digital form . . . ." 17 U.S.C. § 1202(c). The dispute here is what the term "conveyed in connection with" includes.

Defendants argue that since the CMI is found on the CD, the CMI is only connected to the CD and the Prophet Image included in the Steelbooks does not have any CMI—false or otherwise. For this proposition, Defendants rely on *SellPoolSuppliesOnline.com, LLC v. Ugly Pools Arizona, Inc.*, 804 F. App'x 668 (9th Cir. 2020).

In that case, the Ninth Circuit approved a district court's summary judgment determination "that Plaintiff's false CMI claim under the DMCA fails because Defendants' copyright notice was not 'conveyed in connection with copies' of Plaintiff's work." *Id.* at 670. The court explained:

> Based on the following undisputed facts, Defendants' copyright notice did not suggest that it was associated with or linked to Plaintiff's photos: Defendants' copyright notice was

located at the bottom of the webpage in a shaded box, separating it from the rest of the content on the webpage; Defendants' notice was generic and did not communicate that Defendants owned the photos; Defendants' notice was not located on or next to Plaintiff's photos; and Plaintiff's photos were imprinted with their own copyright markings.

*Id*. at 671.[10]

Plaintiff first counters that other courts have found the "conclusion reached in *SellPoolSuppliesOnline.com* . . . is by no means universal." *Advanta-Star Auto. Research Corp. of Am. v. Reynolds Ford, Inc.*, No. CIV-19-912-G, 2020 WL 5823537, at *5 (W.D. Okla. Sept. 30, 2020) (collecting cases). It also cites a recent case where the court held that "there is a factual dispute" about whether the defendant's "Caroline's Treasures" notation was CMI. *Powers v. Caroline's Treasures Inc.*, 382 F. Supp. 3d 898, 906 (D. Ariz. 2019).

In that case, the defendant sold items showcasing the plaintiff's dog drawings on various websites such as Amazon. The dispute was whether the defendant's notation was CMI even though the notation was "not on the works in question" but instead was "off to the side or underneath" it on the websites. *Id*. That court explained that while "conveyed in connection with" a work "does not necessarily mean CMI must be placed directly upon or affixed to a copyrighted work, . . . [a] number of courts have held that for CMI to be protected, it must be near, around, or on the original work." *Id*. (citing *Personal Keepsakes, Inc. v. Personalizationmall.com, Inc.*, 975 F. Supp. 2d 920, 927–29 (N.D. Ill. 2013)). That court, however, ultimately denied the relevant part of the motion for summary judgment since it decided that a jury could find the notation was conveyed in connection with the works." *Id*.; s*ee also Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 305 (3d Cir. 2011) (finding that CMI, as defined in section 1202(c), has a broad meaning such that a photographer's name could be CMI even if it only is in a printed gutter credit near the image).

---

[10] The court noted that the last fact was not dispositive given the other undisputed facts. *Id*. at 671 n.1

The Court is persuaded that there is a factual dispute about whether the CMI on the CD should be considered the Prophet Image's CMI. First, while the CMI is not on the Prophet Image, it is near it as both the CD and the image are within the same Steelbook. Second, *SellPoolSuppliesOnline.com* is not binding and its facts are readily distinguishable. The CMI here is not separated from the rest of the content, is located next to the Prophet Image, and the Prophet Image does not have its own copyright markings. A reasonable jury could find that the CMI located on the CD in the Steelbooks is "information conveyed in connection with" the Prophet Image.

### 3.   Scienter

Finally, Defendants argue that Plaintiff is unable to prove that they acted with the necessary scienter requirements—"knowingly and with the intent to induce, enable, facilitate, or conceal infringement." *See* 17 U.S.C. § 1202(a). Plaintiff responds that the scienter required for a DMCA violation can be proven through circumstantial evidence. *See GC2Inc.*, 391 F. Supp. 3d at 841–42. He contends that he will therefore be able to circumstantially prove bad intent through evidence showing striking similarity and/or copying by Defendants. *See* Dkt. No. 116 at 16–17 (collecting cases holding as such).

When viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, Plaintiff may be able to circumstantially show Defendants possessed the scienter required to violate the DMCA pursuant to section 1202(a). As such, summary judgment is inappropriate, and this part of Motion II should be denied.

The Court accordingly recommends that the section 1202(b) portion of Motion II be granted; however, the rest of Motion II should be denied.

### c.  Motion III: Lack of Nexus

The final motion addressed here has to do with damages. Due to the alleged copyright infringement, Plaintiff seeks "all of [Defendants'] profits attributable to the infringements, pursuant to 17 U.S.C. § 504(b)." Complaint at ¶ 31; *see also* Dkt. No. 103-55 at 3. Section 504(b) of the Copyright Act entitles a successful copyright plaintiff to recover "any profits of the infringer that are attributable to the infringement . . . ." 17 U.S.C. § 504(b)*.* "The award of the infringer's profits examines the facts only from the infringer's point of view. If the infringer has earned a profit, this award makes him disgorge the profit to insure that he not benefit from his wrongdoing." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 159 (2d Cir. 2001), *as amended* (May 15, 2001). The statute creates a burden-shifting provision, stating:

> In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b*); see also MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 366–67 (5th Cir. 2010) (citation omitted). "[O]nce liability has been shown, § 504(b) creates an initial presumption that the infringer's 'profits ... attributable to the infringement' are equal to its gross revenue." *MGE UPS Sys.*, 622 F.3d at 367 (quoting *Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005)) (ellipsis in original). "In meeting its initial burden, however, a copyright holder must show more than the infringer's total gross revenue from *all* of its profit streams .... Rather, 'gross revenue' refers only to revenue *reasonably related* to the infringement." *Id*. (quoting *Bonner*, 404 F.3d at 294) (ellipsis in original). "The question will often be highly fact-specific." *Estate of Vane v. The Fair, Inc.*, 849 F.2d 186, 190 (5th Cir. 1988).

In Motion III, Defendants claim that even if Plaintiff can prove copyright infringement, he has not sufficiently demonstrated the nexus between the alleged infringement and Defendants'

gross revenue from sales required to be awarded damages. In other words, Defendants contend that Plaintiff cannot as a matter of law show that sales of *Black Ops 4* are attributable to Defendants' use of the Prophet Image. However, questions of fact exist regarding whether sales of *Black Ops 4* are reasonably related to the Prophet Image.

The parties agree that the Prophet Image was used to market *Black Ops 4*. It was sold as a standalone poster and as part of a Call of Duty calendar.[11] *See* Dkt. No. 103-12. It was the centerpiece of the artwork on the inside of the Steelbooks. *See* Dkt. No. 114-12 at 4. Finally, it was displayed on nine billboards in New York, Los Angeles, and Chicago. *See* Dkt. No. 103-13; Dkt. No. 103–14 at 8, 16, 17, 24, 42–45, 50.

Defendants claim Plaintiff must show more to survive summary judgment. They argue Plaintiff must at this stage essentially prove how much the Prophet Image drove sales of *Black Ops 4*. They rely on various cases from around the country for this proposition. *See, e.g.,* Motion III at 10 (citing *Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002) (clarifying the Ninth Circuit's understanding of section 504(b)).

That is not the standard at this stage, however, at least in the Fifth Circuit. All Plaintiff must do is show that a reasonable jury could find that sales of *Black Ops 4* are reasonably related to Defendants' use of the Prophet Image. He has done so. He showed that Defendants used the Prophet Image to market *Black Ops 4*. Defendants' representative admitted that "Defendants' objective in its advertising and marketing of" Black Ops 4 is to "see sales of the game." Dkt. No. 114-8 at 20:22–21:2. She also admitted that Defendants used billboards to market their next Call of Duty game. *See id.* at 44:17–24.

---

[11] Defendants agree that these direct sales of the Prophet Image fall under section 504(b). *See* Motion III at 2 n.1.

This is also not a situation where Plaintiff asks for profits on unrelated products, as in *On Davis*, 246 F.3d at 152. In that case, the plaintiff sued defendant, The Gap, Inc., for using his eyewear in an advertising campaign without his permission. He provided the overall revenues of the entire Gap parent organization. The Second Circuit affirmed the district court grant of summary judgment, explaining that:

> Because the ad infringed only with respect to Gap label stores and eyewear, we agree with the district court that it was incumbent on Davis to submit evidence at least limited to the gross revenues of the Gap label stores, and perhaps also limited to eyewear or accessories. Had he done so, the burden would then have shifted to the defendant under the terms of § 504(b) to prove its deductible expenses and elements of profits from those revenues attributable to factors other than the copyrighted work.

*Id*. at 160. Here, Plaintiff limited his gross revenues number to the gross revenues of *Black Ops 4* only. The Prophet Image was used to market that game. The connection is clear.

At this point, the burden shifts to Defendants to prove their "deductible expenses" and that "profit [is] attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). The cases provided by Defendants do not change this result.[12]

Accordingly, Motion III should be denied.

## IV.    CONCLUSION

Accordingly, IT IS RECOMMENDED that:

(1) Defendants' Motion for Summary Judgment of No Standing and No Copyright Infringement (Dkt. No. 103) be **DENIED**;

(2)  Defendants' Motion for Summary Judgment of Lack of Nexus (Dkt. No. 105) be **DENIED**; and

---

[12] The Court notes that most of those cases were post-trial appeals. *See MGE UPS Sys.*, 622 F.3d at 363 (appealing the district Rule 50(a) dismissal); *Vane*, 849 F.2d at 187 (appealing the district court's directed verdict); *but see Mackie*, 296 F.3d  at 911, 913 (appealing an order granting summary judgment but only after the district court held a bench trial on damages). This analysis would be different if it occurred after a trial, where the parties present their cases and provide their evidence.

(3) Defendants' Motion for Summary Judgment of No Violation of 17 U.S.C. § 1202 (Dkt. No. 104) be **GRANTED** as to §1202(b) but otherwise **DENIED**.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this report within 14 days bars that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. FED. R. CIV. P. 72(b)(2); see *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc). Any objection to this Report and Recommendation must be filed in ECF under the event "Objection to Report and Recommendation [cv, respoth]" or it may not be considered by the District Judge.

**SIGNED this 13th day of December, 2020.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE